[No. B239385. Second Dist., Div. Four. July 20, 2012.]

In re FREDERICK DAVIDSON on Habeas Corpus.

**COUNSEL**

Jennifer Hansen, under appointment by the Court of Appeal, for Petitioner Frederick Davidson.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Julie A. Malone and Nikhil Cooper, Deputy Attorneys General, for Respondent The People.

## OPINION

**EPSTEIN, P. J.**—This is an appeal by the Board of Parole Hearings (Board) from a superior court order granting petitioner's application for a writ of habeas corpus. The writ was granted after the Board denied parole to Frederick Davidson, ordering instead a three-year further period of incarceration. Because we find "some evidence" to support the Board's conclusion that Davidson's release at this time would present an unreasonable risk to public safety, we reverse the ruling of the superior court.

## FACTUAL AND PROCEDURAL SUMMARY

Davidson was convicted of second degree murder. (Pen. Code, § 187 et seq.—the commitment offense; all further statutory citations are to this code unless another is identified.) The conviction was based on his driving while intoxicated, resulting in a collision in which the driver of another car was killed. (See *People v. Watson* (1981) 30 Cal.3d 290, 300 [179 Cal.Rptr. 43, 637 P.2d 279] [the leading decision on this theory of second degree murder].) We affirmed the conviction in a nonpublished opinion (*People v. Davidson* (Dec. 9, 1997, B109476)), and we take our account of the crime from the factual summary in that opinion.

Davidson had been drinking at a bar and pool hall in January 1996, where he consumed at least six beers over a period of about three hours. His speech was slurred, his voice loud, and he had problems walking. He was stumbling and disoriented, and bumped into a wall. He was "definitely intoxicated." One of the servers refused to serve him more alcohol and told him that he should not be driving. Nevertheless, and despite the warning, he got into his car with his teenage son, and drove off. It was then about 9:00 p.m. in the evening. He resumed drinking after leaving the bar. Later that evening, while driving at a high speed, Davidson failed to stop at a posted stop sign at an intersection. He collided broadside with a car driven by Luther Wafford, who died as a result. Analysis of a blood sample taken at 12:43 a.m. the next morning showed Davidson had a blood-alcohol level of 0.29 percent, which is close to quadruple the legal limit of 0.08 percent. (Veh. Code, § 23152, subd. (b) [driving with a blood-alcohol level of 0.08 percent or higher is per se illegal].)

Davidson is an alcoholic. This was not his first conviction for driving under the influence. He had been convicted in 1993 for driving under the influence, causing injury; at that time his blood-alcohol reading was 0.34

percent. His license was still suspended in 1996, when the commitment offense occurred. He had been convicted, twice, in Oregon for driving under the influence (in 1986 and 1987). There also were other occasions when Davidson drove while under the influence, but was not arrested. We affirmed Davidson's conviction, finding the evidence amply supported the finding of implied malice. Davidson was sentenced to state prison for an indeterminate term of 15 years to life. He was 46 years old at the time.

In March 2010, when Davidson was 60 years old, he submitted to a detailed evaluation by a prison psychologist. The reviewer, S. Thacker, Ph.D., concluded that Davidson had realistic and feasible parole plans. Davidson indicated that he had been accepted into two transitional release programs. One of them, the New Life Institute in Canyon Country, is a residential program involving work, Bible studies, and participation in 12-step programming. The other, Hacienda Christian Life Campus, has a facility in Perris, California. Davidson is active in Alcoholic Anonymous (AA) programs and intends to remain so for the indefinite future. He plans to lead a sober lifestyle with persons who do the same, and to remain active in Bible studies and Christian friendships. He hopes to become a substance abuse counselor in one of the programs that has accepted him.

Davidson previously had applied for parole. The Board had issued a three-year parole denial at that time. In connection with that application, he had been diagnosed as alcohol dependent. The present evaluator found that Davidson had reflected on his life and character, and had recognized that his previous approach in dealing with emotions by drinking alcohol was ineffective. He acknowledged his "past immaturity, selfishness and irresponsibility," particularly with respect to his wife and children. He expressed regret and remorse.

Describing the commitment offense to Dr. Thacker, Davidson said that he "had a short in [his] headlights and [he was] pretty sure they had gone out." He said that he must have passed out before failing to heed the stop sign. He was traveling at 55 miles per hour, slammed on the brakes, but it was too late. Nevertheless, he acknowledged that the crime was entirely his fault; it would not have happened if he "had been doing the right thing." Asked how he would keep out of trouble in the future, he said that he would not "break the law, will not drink." As for driving, he said that he could still ride a bicycle and probably would get his driver's license back eventually.

As Davidson described the commitment offense at the parole hearing, "I went out, and I got in the car, and I went out with my son. And I went to a

bar, pool hall in Lancaster, California. I had too much to drink. I was not, I didn't have a program in place to realize the depth of my disease. I didn't really understand it myself, and I got drunk, and I went out, and I got into an accident. And the collision cost the life of Luther Wafford, and that's why I'm here today."

As to remorse and insight, the evaluator noted that these are abstract concepts, which do not lend themselves to "operationalized definition or measurement." Davidson took full responsibility for the crime, which he attributed to his own immaturity and refusal to accept the fact that he could not control his drinking. He said he had been caring for his father, then grieving his father's death, and that these were stressors that contributed to the drinking.

While in prison Davidson continuously participated in AA programs, and completed several educational and self-help programs. During the more than 13 years before his recent parole hearing, he had never received a "115" citation (for violation of law under circumstances that are not minor in nature) and received only four "128A's" (for minor infractions). Davidson also completed a "vocation" (training program) in textile and garment making, earned credits towards a community college degree, and received more than a dozen positive "chronos" (memoranda to the file).

Employing several measures, the evaluator concluded that Davidson was in the lowest range of risk for future violence, as compared with other prison inmates. Summarizing, the evaluator stated that "[a]fter weighing all of the data from the available records, the clinical interview, and the risk assessment data, it is opined that Mr. Davidson presents a **low** risk for violence in the free community. [¶] Mr. Davidson's risk of violent recidivism would likely *increase* if he returned to the use of intoxicating substances, associated with antisocial peers or other substance abusers, found himself without a stable residence, lacked income sufficient to meet his living expenses or had inadequate social support in the community. [¶] No areas of concern were identified which this evaluator determined would need to be addressed in order for Mr. Davidson to further *decrease* his risk of violence."

The trial court had imposed a restitution order, requiring Davidson to pay $1,500 to the victim's family. He paid it in full from prison wages, taking almost 13 years to do so. From prison wages and an inheritance, Davidson has about $20,000 set aside.

At the parole hearing, Davidson reiterated that the victim's death was entirely his fault, due to his drinking and driving. He plans never to drink alcohol again. If released from prison he plans to go to the Hacienda

Christian Life camp, a complete facility where he can learn additional job skills and receive job training. That program has a job placement program, "excellent residential 12-step programs, treatment programs where [he] can become involved in the community in learning how to be a counselor as well down there. And they have a good church facility." He plans to be in some sort of substance abuse program for the rest of his life. He would totally immerse himself in the program, and his ex-wife and children would be supportive. None of his family members drink; he explained, "I think I scared that out of them."

Davidson acknowledged that he had quit drinking before, on his own, but then relapsed. He "always thought that [he] could do that, . . . that [he] could do it by [himself], that [he] didn't need anybody. . . . But that's not the case now." The last time he stopped drinking was for a period of about three and a half weeks, and he had previously quit for a six-month period before that. He claimed that he had not consumed any alcohol during the time he has been incarcerated.

He recognized what triggered his drinking: despair, extreme sadness, depression, and loneliness. He learned to deal with these through AA and the church. He does not have a sponsor yet, but plans to get one as soon as he gets to a rehabilitation facility, as "that's the first thing they do."

At the parole hearing the Board issued a three-year denial, making him eligible to apply again in 2013. The denial was based on the commitment offense and lack of insight. The Board called out several specifics with respect to lack of insight, which we discuss in the next part of this opinion. It concluded that Davidson was not yet ready to be paroled, but that he was "a work in progress."

Davidson sought habeas corpus relief from the Board's decision. His petition was contested by the Board, and, following briefing and argument, the trial court granted the relief he sought. In a detailed written order, the court ruled that the Board's decision is not supported by some evidence in the record that Davidson is currently dangerous. The court directed the Board to vacate its order denying parole and conduct a new hearing. The Board filed a notice of appeal, and we granted its petition for supersedeas, staying further proceedings pending our review.

## DISCUSSION

For nearly a decade it has been settled law that judicial review of the Board's decision to grant or deny parole (as well as review of the Governor's decision to overturn a Board decision) is limited to deciding whether the

decision is supported by "some evidence related to the pertinent criteria specified by law." (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 670 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) This standard has been repeatedly reaffirmed by our Supreme Court, most recently in *In re Shaputis* (2011) 53 Cal.4th 192 [134 Cal.Rptr.3d 86, 265 P.3d 253] (generally referred to as *Shaputis II* to distinguish it from an earlier decision involving the same petitioner, *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573], referred to as *Shaputis I*; we will follow that convention here).

The "some evidence" standard is extremely deferential, far more so than the substantial evidence standard generally applied in appellate review of trial court decisions. (*Shaputis II, supra*, 53 Cal.4th at p. 210.) Under the "some evidence" standard only a modicum of evidence is required. (*Ibid.*) As the court said in *Rosenkrantz* and repeated in *Shaputis II*, the precise manner in which specified factors relevant to parole suitability are considered and balanced is within the discretion of the Board (or the Governor). So it is "irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole. As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision." (*Rosenkrantz, supra*, 29 Cal.4th at p. 677; see *Shaputis II*, at p. 210.)

The basis for this judicial reticence is found in the separation of powers doctrine. The decision to grant or deny parole is vested in the executive branch, and its determinations are not to be second-guessed by the judicial branch. The reason there is any standard at all is to afford relief in cases where the decision of the Board or the Governor is arbitrary or capricious. (*Shaputis II, supra*, 53 Cal.4th at p. 199.)

The ultimate question before the parole-granting authority is whether the inmate's release would unreasonably endanger public safety. (*Shaputis II, supra*, 53 Cal.4th at p. 200.) And while the evidence against parole suitability must be probative of the inmate's current dangerousness, "it is not for the reviewing court to decide *which* evidence in the record is convincing. [Citation.]" (*Id.* at p. 211.)

While this standard of judicial review is deferential, probably more than any other, it " 'is not toothless' " and must be sufficiently robust to reveal and remedy any evident deprivation of constitutional rights, "it must not operate so as to 'impermissibly shift the ultimate discretionary decision of parole suitability from the executive branch to the judicial branch . . . .' " (*Shaputis II, supra*, 53 Cal.4th at p. 215, quoting *In re Lawrence* (2008) 44 Cal.4th 1181, 1212 [82 Cal.Rptr.3d 169, 190 P.3d 535].)

While we generally defer to the decision of the trial court on issues of fact and subjective judgment, in a parole case such as this, the trial court review and our review are based on the administrative record (and appropriate briefing based on that record), and we exercise our independent review of the trial court's decision. (See *Rosenkrantz, supra*, 29 Cal.4th at p. 667; *In re Van Houton* (2004) 116 Cal.App.4th 339, 349 [10 Cal.Rptr.3d 406].) Our deference is thus to the decision of the executive branch expressed by the Board or the Governor, not to the trial court.

■ As we have seen, the Board denied review on the basis of the commitment offense and the petitioner's lack of insight. The former is significant only as it informs the ultimate question whether release of the inmate would present an unreasonable risk to public safety.

In its decision, the Board discussed serious aspects of the commitment offense: defendant's deliberate decision to drive a vehicle when he was in no condition to do so, knowing the risks that doing so entailed, and the resulting tragedy in which an innocent motorist lost his life. Under the statutory formula established in section 3041, subdivision (b), the Board must grant parole unless it determines that, under the applicable regulations, the prisoner is unsuitable for parole. Thus, "parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." (*Rosenkrantz, supra*, 29 Cal.4th at p. 654.)

In its decision, the Board called out several factual matters, apparently collected under the rubric of "insight, or lack thereof." These are Davidson's statement to the evaluator that the headlights on the vehicle he was driving were dysfunctional or not on; his failure to include the victim, Luther Wafford, at one point in his recitation of those to whom he should make amends; relatively small discrepancies in his recollection of blood-alcohol levels at the time of the arrest leading to his previous driving under the influence conviction and the commitment offense in this case; and his reference to the collision as an accident. The trial court, and petitioner's counsel on appeal, focus on the insignificance of these references. Even under the deferential standard we are applying, we find little here of moment. Davidson did mention the headlight problem, but at the same time he reasserted his own culpability. While he may have omitted to mention Mr. Wafford at one point in his testimony, he repeatedly referred to him and to his family, and the tragedy of the loss, at other points. And his reference to

the collision as an "accident" was literally true, as the commissioner who summed up recognized ("you accidentally took the life of Mr. Wafford" by choosing to drive while intoxicated).

It is difficult to conclude that Davidson minimized his crime or tried to excuse it in light of his repeated expressions of being the sole cause of the homicide. But, again, the focus is on the ultimate decision the Board had to make: whether his release presents an unreasonable risk to public safety. From a reading of the entire record, and particularly of the proceedings before the Board, we believe the Board's decision that it would is supported by some evidence in the record.

■ As we have noted, and as Davidson has acknowledged, he is an alcoholic. If his testimony is to be believed, he has not consumed alcohol since the commitment offense. But he has been in a controlled environment during that entire time. Once released he will be able to obtain alcohol readily and at will. According to his own accounts, he has abstained from drinking before, only to relapse. And his record of drunk driving is a matter of serious concern, and it does bear on parole suitability. Once released he, like almost anyone, will face pressures of ordinary life, and hopefully will be able to cope with them without resort to the quick and the momentary escape that drinking may seem to afford. He has good plans and has expressed good intentions. It was for the Board to decide whether he would be able to carry them out. As the presiding commissioner twice observed, Davidson is a "work in progress."

The Board concluded that a five-year or greater denial of parole was not warranted. Instead, it imposed the relatively brief term of three years. In doing so it recommended, among other things, that Davidson update his parole plan to include a substance abuse relapse plan. Given the Board's expression and its recounting of the favorable information before it about Davidson—his virtually clean record while in prison, his participation in AA, Bible classes, vocations, his earned certificates, including a certificate of proficiency from prison industries, and college class parole plans (which a Board member described as "the way to go"), as well as his family support and his age—the Board's decision extends hope that he will be suitable for parole the next time he is eligible for a hearing. But the nature of his problem and the record support the Board's conclusion that his release now would pose too great a risk to the public.

For the present, and on this record, there is "some evidence" to support the Board's conclusion that he is not suitable for parole.

## DISPOSITION

The judgment is reversed and the supersedeas stay is dissolved.

Willhite, J., and Suzukawa, J., concurring.

Petitioner's petition for review by the Supreme Court was denied October 31, 2012, S205059.